**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Justin R. Hall, being first duly sworn, hereby depose and state as follows:

**SUMMARY OF PROBABLE CAUSE**

A 14-year-old girl told investigators that a man named Anthony Thor Sams touched her breasts and vagina while she was a guest at his home for a sleepover. She said that while Sams was touching her, she could see flashes and hear a clicking noise, so she thought he might have taken pictures of her.

Sams gave investigators permission to search his phone, and investigators did indeed find sexually explicit photos of the girl. They also learned that Sams' device was set up to automatically synchronize the photos on his device to Google servers using the Google Photos service and that someone accessed Google Photos on that device on the date of the assault near the time when it occurred. I am seeking a warrant to search the Google photos account for sexually explicit photographs of the 14-year-old girl, and for attribution evidence indicating that Sams was the user of the Google Photos service and device.

**AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with Google accounts "dieflyant22@gmail.com" and "maiingan.sams@gmail.com" (hereinafter Target Accounts) that are stored at premises owned, maintained, controlled, or operated by Google, LLC. (Google), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to

disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since April, 2021.  I am currently assigned to the Detroit Division, Traverse City Resident Agency, where my duties include investigation of crimes against children occurring within the territorial jurisdiction of the United States.  Prior to becoming an FBI Special Agent, I was employed as a Police Officer for the Jacksonville Police Department in North Carolina for over 6 years.  My investigative experience includes interviewing victims and witnesses, conducting searches of physical locations, social media, and electronic devices pursuant to court order or consent. I have received specialized training for crimes against children from the FBI's Crimes Against Children and Human Trafficking Unit.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. Section 2251(a) and (e), attempted sexual exploitation of a child and sexual exploitation of a child, have been committed by Anthony Thor Sams (Sams).  There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), &

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. On the morning of February 14, 2022, a detective employed by the Grand Traverse Band of Ottawa and Chippewa Indians (GTBOI) Tribal Police Department was contacted by Parent A, the mother of a 14-year-old female (Victim 1), who wanted to report a sexual assault. Later on February 14, 2022, FBI Agents contacted Parent A and interviewed Parent A, and Parent B, the father of Victim 1. Parent A stated that their daughter, Victim 1, attended a sleep over at the residence of Anthony Thor Sams (Sams) and Sams' spouse (hereinafter Witness C), who is the adult daughter of Parent A, on Saturday, February 12, 2022. This residence was located at 3580 N. Putnam Road, Suttons Bay, Michigan. The following morning on Sunday, February 13, 2022, Victim 1 reported to Witness C that Sams touched Victim 1 inappropriately on her breasts, buttocks, and vagina during the early morning hours of February 13, 2022 while Victim 1 and other children were asleep in a room of Sams' residence. Victim 1 told Witness C that she believed Sams took pictures of her during the incident since she saw flashing light and heard clicking sounds. Parent A spoke with Victim 1 and Witness C via Facetime over Witness C's cellular telephone, and Victim 1 provided a brief account of what happened. Parents A and B then traveled to the Sams residence that same morning. Victim 1 was then taken home by Parents A and B.

7. On February 14, 2022, Sams agreed to be interviewed by the FBI and a GTBOI Tribal Police Detective. Following the interview, Sams provided voluntary and written consent to allow investigators to conduct a search of his cellular telephone, which was identified as an

iPhone 13 bearing serial number PF3FHM9NLC and subscriber telephone number of 231-313-7343.

8. On February 16, 2022, Victim 1 was interviewed by a child forensic interviewer. During the interview, Victim 1 stated that during the early morning hours of February 13, 2022, while staying at the Sams residence, she was asleep on the couch next to one of Sams' daughters. Victim 1 felt something touch her on the couch and at first thought it was the foot of Sams' daughter. Victim 1 felt it and realized it was a large arm. Victim 1 heard Sams say, "come here" and he then grabbed her close to his body. Sams put his right arm on Victim 1's butt and then started moving Victim 1's shirt. Sams then moved his arm under Victim 1's shirt and tried get under Victim 1's bra. Sams could not get his hand under the bra so he just left it there. Sams then pulled his arm out and touched Victim 1's butt. Sams then placed his hand under Victim 1's shirt and pulled up Victim 1's bra. Victim 1 described herself as wearing a blue sweatshirt. Sams then placed his hand on one of Victim 1's breasts and held it there. At this time, Sams had placed a blanket over Victim 1's face. Victim 1 saw light flashes go on and off. Sams then put Victim 1's shirt back down and put his hand down her pants underneath her underwear. Sams used his fingers and began to rub Victim 1's vaginal and clitoris area. After several minutes a noise was heard in another part of the house and Sams then stopped, moved Victim 1 back to her previous position on the couch, and left the room. After Sams left the room, Victim 1 remained in the room and then heard someone enter the room and enter the adjacent bathroom. Victim 1 recognized the sound of the person to be Witness C. While sitting up on the couch to await Witness C to come out of the bathroom, Sams came to the entrance of the room where Victim 1 was located and shined a light on Victim 1. Victim 1 looked directly at Sams and he then left. Victim 1 then told Witness C about the incident when Witness C came out of the bathroom.

Victim 1 stated that when she returned home, she placed the clothes she was wearing in a clothes basket in her residence.

9. On February 16, 2022, following the interview of Victim 1, the FBI collected the blue sweatshirt, bra and underwear that Victim 1 was wearing at the time of the incident. The bra was tan/skin toned in color with a front enclosure buckle.

10. On February 17, 2022, I reviewed a forensic extraction from Sams' iPhone. A preliminary review of its contents revealed the following digital images:

   a. Image of a hand lifting up a blue shirt and pulling down a covering portion of a tan bra, exposing a female breast, bearing a date/time stamp of 2/13/2022 5:55:34 AM (UTC-5);

   b. Image of an exposed female breast, partial portion of a tan bra strap, and purple blanket with multicolored design, bearing a date/time stamp of 2/13/2022 6:03:58 AM (UTC-5);

   c. Image of an exposed female breast and torso, tan bra and blue shirt lifted up, and purple blanket with multicolored design, bearing a date/time stamp of 2/13/2022 6:26:15 AM (UTC-5);

   d. Image of a blue shirt and tan bra lifted up, exposed female breasts and torso, and purple blanket with multicolored design, bearing a date/time stamp of 2/13/2022 6:26:27 AM (UTC-5);

   e. Image of two exposed female breasts, blue shirt and tan bra lifted up, and purple blanket with multicolored design, bearing a date/time stamp of 2/13/2022 6:27:10 AM (UTC-5);

      f.   Image of a female vagina, bearing a date/time stamp of 2/13/2022 6:28:42 AM (UTC-5).

11.    I have compared the images of the bra and blue shirt depicted in these pictures with the clothing recovered from Victim 1's residence and they are consistent in both color and appearance, including the front closure buckle. Based on my review of these images and data, I believe these images were produced on Sams' iPhone on February 13, 2022 during his physical and sexual contact with Victim 1.

12.    On February 17, 2022, Sams agreed to be interviewed by FBI Agents at the Traverse City Resident Agency. During the interview, image (f) and image (a) were shown to Sams by FBI Agents, along with dates and times that corroborated Victim 1's account of the sexual contact. Sams told interviewing Agents that he took the images using his iPhone 13 (referenced in paragraph 7 of this Continuation). While viewing an extraction page that contained thumbnail images of image (f) and image (a) along with other unrelated images from his iPhone, Sams advised Agents that some of the images recovered from his iPhone came from his juvenile son's Google Photo account. Sams stated to Agents that his iPhone 13 synced images to Google Photos, a cloud-based photo and video storage service provided by Google. Sams also disclosed to Agents that his juvenile son has a different Apple iPhone that syncs photos to the same Google Photos account. Sams stated he did not believe his son's iPhone has the ability to see images that were uploaded by Sams' iPhone 13.

13.    The foregoing information indicates that Sams took photos of the crimes, while it occurred, on his iPhone 13. A review of the data on Sams' iPhone revealed that a user (whom I infer was Sams) used the Google Photos application the morning of February 13, 2022. The review of data further reflected that his iPhone had connectivity with Google Photos backup

service.  The use of the Google Photos application and the iPhone's connectivity with Google Photos backup service is indicative that evidentiary images of the crime may have been backed up to Google servers.  Location history may contain information indicating whether the accountholder was near the scene of the crime and metadata contained in the images synced to the Google accounts may contain location data associated with each image.

14. A review of the data extraction from Sams' iPhone 13 further revealed that both target accounts were installed as Google user accounts on his device, allowing any photo taken on his iPhone to sync with either or both Google accounts.  Based on my training and experience, I believe there is evidence of the crimes located on the Google Photos account associated with the Target Accounts.

15. On February 16, 2022, the FBI submitted a preservation request for the Target Accounts through the Google Law Enforcement Request System.

## **BACKGROUND CONCERNING GOOGLE**[1]

16. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service

---

[1] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages:  the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

17. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

18. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

19. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

20. Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

21. Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as

contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

22. Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

23. Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

24. Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos,

PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

25. Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google

maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

26. Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

27. A subsidiary of Google, Google Payment Corporation, provides Google Accounts an online payment service called Google Pay (previously Google Wallet), which stores credit cards, bank accounts, and gift cards for users and allows them to send or receive payments for both online and brick-and-mortar purchases, including any purchases of Google services. Users may delete some data associated with Google Pay transactions from their profile, but Google Payment Corporation retains some records for regulatory purposes.

28. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are

11

displayed with a button that allows the user to save the attachment directly to Google Drive. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

29.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

30.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

31.     Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a

communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

32. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. Examination of contents for the aforementioned Google Account services associated with the Target Accounts will allow the United States to locate any additional evidence of the crimes, or confirm its lack of existence.

33. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation. Based on the content review of Sams' iPhone 13, as well as information provided by Sams during the interview on February 17, 2022, it is reasonable to believe that evidence of the crimes exists in the Google Account services associated with the Target Accounts.

34. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

35. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. Sams disclosed to FBI Agents his knowledge of applications like Snapchat and WhatsApp being used for distribution of child sexual abuse material (CSAM), and that he uses both applications. Examination of emails, instant messages, Internet activity, documents, and contact information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

36. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **CONCLUSION**

37. Based on the forgoing, I request that the Court issue the proposed search warrant.

38. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.